# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIGINIA
### BIG STONE GAP DIVISION

**THOMAS WESLEY SALYERS,**   )
       Plaintiff            )
                          )
                          )     Civil Action No. 2:12cv00014
v.                       )     **REPORT AND**
                          )     **RECOMMENDATION**
**CAROLYN W. COLVIN[1]**    )
Commissioner of Social Security,   )     By: PAMELA MEADE SARGENT
        Defendant      )     United States Magistrate Judge

## *I. Background and Standard of Review*

Plaintiff, Thomas Wesley Salyers, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A §1381 *et seq.* (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §1383 (c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Salyers protectively filed his application for SSI on May 27, 2008, alleging disability since August 4, 1998, due to chronic back pain from a spinal fusion of the L5-S1 discs, complications from a machete accident, including two fractured dental roots and a broken bone in his gums, a bulging disc in his neck and wrist pain.[2] (Record, ("R."), at 127, 139, 185.) The claims were denied initially and on reconsideration. (R. at 49-50, 54-55, 69-70.) Salyers then requested a hearing before an administrative law judge, ("ALJ"). (R. at 72-73.) The hearing was held on November 18, 2010, at which Salyers was represented by Jason Mullins, an attorney. (R. at 27-46.)

By decision dated December 2, 2010, the ALJ denied Salyers's claim. (R. at 12-20.) The ALJ found that Salyers had not engaged in substantial gainful activity since May 27, 2008, the date of his application. (R. at 14.) The ALJ determined that the medical evidence established that Slayers suffered from severe impairments, including back pain, neuropathic pain in the mouth and jaw and a pain disorder. (R. at 14.) The ALJ found that Salyers did not have an impairment

---

[2] Even though Salyers does not allege any psychological impairments in connection with his application, a mental evaluation from Robert Spangler, a licensed psychologist, forms the basis of his appeal to this court. (R. at 588-95.)

or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14.)

The ALJ found that Salyers had the residual functional capacity to perform light work[3] requiring no more than occasional climbing, balancing, stooping, kneeling crouching and crawling. (R. at 15.) The ALJ further found that Salyers could maintain attention and concentration for periods commensurate with simple, short, repetitive, routine tasks. (R. at 15.) The ALJ found that Salyers was able to perform his past relevant work as a customer service representative. (R. at 19.) Based on Salyers's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ also found that Salyers could perform other jobs existing in significant numbers in the national economy, including jobs as an assembler, a packer and an inspector/tester/sorter, all at the light level of exertion. (R. at 20.) Therefore, the ALJ found that Salyers was not under disability as defined in the Act and was not eligible for benefits. (R. at 20.) *See* 20 C.F.R.§§ 416.920(f), (g) (2013).

After the ALJ issued his decision, Salyers pursued his administrative appeals, (R. at 7), but the Appeals Council denied his request for review. (R. at 1-5.) Salyers then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2013). The case is before this court on Salyers's motion for summary judgment filed January 24, 2013, and the Commissioner's motion for summary judgment filed February 25, 2013.

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R.§416.967(b) (2013).

## II. Facts

Salyers was born in 1979, (R. at 116), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). He has three years of college education and vocational training in computer and electronic technology, computer repair and manufacturing technology. (R. at 144.) Salyers has past work experience at a telecommunication business as a customer representative and was self-employed as a computer repair technician. (R. at 33-34, 140.) He testified that he is unable to work due to chronic back pain, chronic headaches and dental pain. (R. at 30.) He stated that, following a motor vehicle accident in 1999, he suffered from chronic back pain and headaches. (R. at 30-31.) Salyers testified that he also had an accident with a machete that led to a fractured bone plate in the upper right gum, fractured roots of several teeth and damaged nerves in the lower right jaw. (R. at 31.) He stated that he spends most of his day lying in bed while watching television or doing things on the computer. (R. at 33.) Salyers also testified that he was no longer undergoing any procedures on his jaw or mouth, stating that he was being treating only with gabapentin. (R. at 34.)

John Newman, a vocational expert, also was present and testified at Salyers's hearing. (R. at 39-45.) He classified Salyers's past work as a customer service representative as sedentary[4] and semi-skilled. (R. at 41.) Newman

---

[4] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. *See* 20 C.F.R. § 416.967(a) (2013).

classified Salyers's past work as a computer repair technician as medium[5] and skilled. (R. at 41.) He testified that a hypothetical individual of Salyers's age, education and work history, who could perform light work that required the performance of postural movements no more than occasionally, could perform Salyers's past relevant work as a customer service representative. (R. at 41-42.) Newman further testified that this hypothetical individual could perform unskilled work at the light exertional level, including that of an assembler, a packer and an inspector/tester/sorter. (R. at 42.) Newman next testified that the same hypothetical individual, but who also experienced daily pain resulting in an ability to perform only simple, repetitive tasks, could perform the jobs of an assembler, a packer and an inspector/tester/sorter, as they are unskilled. (R. at 42.) He testified that more than one absence per month in any of these jobs would preclude competitive employment. (R. at 43.) Newman next testified that an individual with the limitations set forth in the October 26, 2010, psychological evaluation, completed by psychologist Spangler, would be precluded from competitive employment based on the finding that the individual had no ability to demonstrate reliability due to an anticipated rate of absenteeism, as well as the finding that the individual was seriously limited in the ability to perform simple job instructions. (R. at 43-45, 588-95.)

In rendering his decision, the ALJ reviewed records from Bristol Neurosurgical Associates; Wellmont-Bristol Regional Medical Center; Norton Community Hospital; Dr. Maurice Nida, M.D.; Community Physicians; Maria W. Bryan, D.D.S.; Dr. Robert McGuffin, M.D., a state agency physician; David Pond,

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2013).

D.D.S.; Lonesome Pine Hospital; Wise Medical Group; B. Keith Elliott, D.D.S.; Dr. Stephen Kimbrough, M.D., a neurologist; Dr. Daryl Larke, M.D.; Robert Kilgore, D.M.D.; Ronald F. Godat, D.D.S.; Dr. Frank M. Johnson, M.D., a state agency physician; Carroll Mullins, D.D.S.; Dr. Esther Adade, M.D.; Mountain View Regional Medical Center; and Robert Spangler, L.P.C., a licensed psychologist. Salyers's attorney submitted additional records from Dr. Kimbrough to the Appeals Council for review.[6]

The record shows that Salyers underwent a bilateral L5-S1 decompression, laminectomy, diskectomy and interbody arthrodesis using Ray cage technique with autograft fusion on August 4, 1998, after x-rays of the lumbar spine revealed a bilateral spondylolysis and grade-I spondylolisthesis. (R. at 527-28, 550.) Subsequent radiographic studies showed excellent placement of the Ray cages, and no further evidence of instability was apparent. (R. at 546.) X-rays of Salyers's lumbar spine, dated September 25, 1998, showed subtle anterior subluxation of L5 on S1, and the metallic spacers at the L5-S1 disc space were appropriately positioned. (R. at 522.) Physical examination on October 19, 1998, showed normal lumbar curvature with no areas of focal tenderness or spasm. (R. at 541.) Flexion and extension were performed with normal segmentation, at about 50 percent of the range of normal. (R. at 541.) Salyers's gait was normal, tendon reflexes were 1+ at the knees and trace at both ankles, and there was no focal weakness. (R. at 541.) He was neurologically intact. (R. at 541.) X-rays revealed normal configuration of the post-operative changes. (R. at 521, 541.) X-rays dated

---

[6] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-5), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

November 9, 1998, showed excellent alignment of L5-S1, no signs of fracture and no signs of disruption or dislocation.  (R. at 540.)

On January 11, 1999, Salyers was described as clinically doing very well.  (R. at 539.)  Physical examination showed diffuse lumbar tenderness and paraspinous muscles that were not very developed.  (R. at 539.)  Nonetheless, range of motion was "surprisingly good," straight leg raise testing was negative bilaterally, and tendon reflexes were 1+ at the knees and ankles.  (R. at 539.)  A CT scan of the lumbar spine showed a concentric protrusion at the L4-L5 disc space without significant eccentricity or evidence of disc protrusion.   (R. at 518.)  Otherwise, only mild facet disease was noted.  (R. at 518.)  Physical examinations on January 18, 1999, and March 24, 1999, were relatively benign, and a lumbar myelogram showed an excellent fusion with no suggestion of thecal sac or nerve root compression.  (R. at 537-38.)  Dr. Matthew W. Wood, Jr., M.D., opined that Salyers primarily needed physical therapy.  (R. at 538.)

Following a motor vehicle accident, X-rays of Salyers's cervical spine and lumbar spine, dated May 18, 2004, showed only surgical changes at the L5-S1 disc space.  (R. at 223-24, 254.)  A lumbar MRI from June 4, 2004, revealed only mild edema at the inferior end plate of L5 and no disc herniation or narrowing of the spinal canal or neural foramina.  (R. at 225, 255.)

The record shows that Salyers was injured in 2007 when he fell face first onto a machete.  (R. at 31.)  Salyers fractured the bone plate in his upper right gum, fractured the roots of multiple teeth and suffered nerve damage to the lower right jaw.  (R. at 31.)  He presented to the emergency room at Norton Community on October 4, 2007, with a laceration to his mouth and a facial injury after falling onto

a railroad track. (R. at 340-42.)  A laceration of Salyers's upper lip was sutured, and Salyers was diagnosed with dislocated right upper teeth.  (R. at 340-42, 346.) An x-ray of Salyers's facial bones was ordered.  (R. at 341, 347.)  He was prescribed Keflex and Percocet on discharge.  (R. at 347-49.)  A facial bone study, conducted by Dr. Elpidio Capalad, M.D., on October 4, 2007, showed an apparent dislocation of the nasal bone from the nasal process of the frontal bone.  (R. at 234.)

On October 29, 2007, Salyers again presented to the emergency room at Norton Community complaining of a severe toothache with a swollen jaw. (R. at 352-54.)  He reported that his dentist did not give him enough pain medication to last through the weekend.  (R. at 356.)  He was prescribed Ultram and Anaprox and was advised to see a dentist as soon as possible.  (R. at 358.)

An MRI of the cervical spine, dated February 7, 2008, revealed mild degenerative disc disease without focal disc herniation or significant central canal stenosis. (R. at 258.) An MRI of the lumbar spine, dated February 18, 2008, that revealed mild bulging of the disc at L4-L5 disc space level with no narrowing of the central spinal canal or neural foramina. (R. at 260.)  On February 29, 2008, Salyers was advised by Shelli Crockett, F.N.P., to exercise and return to full duty, as this would help more than anything to strengthen his muscles. (R. at 262.) Crockett noted that Salyers had a dental abscess and was scheduled for a root canal the following week.  (R. at 262.)  He requested more pain medication, and she prescribed Lortab because Salyers's dentist was out of town.  (R. at 262.)

Salyers saw Maria Bryan, D.D.S., an endodontist, from February 19, 2008, to June 23, 2008, during which time he complained of constant dental pain for

which he requested pain medication regularly. (R. at 294-96.) According to the medical records for April 15, 2008, a pharmacist notified Bryan that Salyers obtained two prescriptions for Lortab the previous day, using only one hard copy, and Bryan noted in the medical chart to observe and use caution in the future when dealing with Salyers. (R. at 294.)

Salyers frequented the office of David Pond, D.D.S., from June 25, 2008, to April 22, 2009, complaining of pain in his gums, cheek and various teeth, and he frequently complained of swelling. (R. at 315-16.) Salyers requested pain medication or tooth extraction for treatment, and he received many prescriptions for Lortab and Percocet. (R. at 315-16.) However, treatment records show that Salyers went through his prescriptions quickly. (R. at 315-16.)  He underwent an apicoectomy on July 2, 2008.  (R. at 315.)[7]  On July 9, 2008, Pond noted that Salyers's mouth was healing well, and he referred him to a neurologist. (R. at 315.)

Salyers presented to the emergency room at Norton Community on July 6, 2008, complaining of back pain. (R. at 380-82.) Physical examination demonstrated a nontender back, painless range of motion and a normal back inspection. (R. at 381.) He was diagnosed with chronic back pain and was prescribed Flexeril and Naproxen.  (R. at 383, 386.)  An x-ray dated July 26, 2008, of Salyers's lumbosacral spine revealed no acute fractures or dislocations or other acute process.  (R. at 429.)

---

[7] An apicoectomy is the excision of the apical portion of a tooth through an opening made in the overlying labial, buccal or palatal alveolar bone.  It also is called a root resection.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 111 (27th ed. 1988).

On July 29, 2008, Dr. Frank M. Johnson, M.D., a state agency physician, completed a physical residual functional capacity assessment, ("RFC Assessment"), of Salyers. (R. at 447-52.) Dr. Johnson found that Salyers could lift and/or carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 448.) He found that Salyers could stand and/or walk for a total of about 6 hours in an 8-hour workday and could sit for about six hours in an eight-hour workday. (R. at 448.) Dr. Johnson found that Salyers's ability to push and/or pull was unlimited, other than the lift and/or carry restrictions. (R. at 448.) Dr. Johnson also found that Salyers could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 449.) He imposed no manipulative, visual, communicative or environmental limitations. (R. at 449-50.) Dr. Johnson concluded that Salyers's allegations were not fully supported and were not considered fully credible. (R. at 452.)

On September 23, 2008, Salyers presented to the emergency room at Lonesome Pine Hospital complaining of back pain. (R. at 432-33.) However, physical examination revealed a nontender back, painless range of motion, negative straight leg raise testing bilaterally and an overall normal back inspection. (R. at 432-33.) Salyers was diagnosed with acute myofascial strain. (R. at 433.)

Salyers underwent several root canals by B. Keith Elliott, D.D.S., M.S.D., at New South Endodontics from October 13, 2008, to January 14, 2010. (R. at 476-98.) Over this time period, Salyers was prescribed Lortab and penicillin multiple times. (R. at 476-98.) On January 20, 2008, he complained of soreness from a root canal performed six days earlier. (R. at 491.) He was informed that this was normal and that his x-rays looked "great." (R. at 491.) Salyers was advised to take ibuprofen and Tylenol, and a notation that Salyers was to get no more pain

medication was entered in his medical chart.  (R. at 491.)  On January 6, 2010, Salyers again complained of pain.  (R. at 498.)  Elliott noted some swelling of the cheek, but no other symptoms.  (R. at 498.)  Salyers's x-rays looked "good," but his gums were very red, and Elliott suggested that this be looked at.  (R. at 498.)  Elliott opined that no root canal was needed at that time.  (R. at 498.)

From October 20, 2008, to June 30, 2009, Salyers saw Dr. Stephen M. Kimbrough, M.D., a neurologist, with complaints of gum and jaw pain.  (R. at 458-60.)  Dr. Kimbrough diagnosed Salyers with neuropathic pain of the mouth, and prescribed gabapentin, Percocet and amitriptyline. (R. at 458-60.)  On June 30, 2009, Dr. Kimbrough noted that, while the medications had helped overall, Salyers had increased burning and stinging in the mornings and increased pain in the upper teeth area.  (R. at 458.)  Physical examination revealed some hypersensitivity in the right jaw and tenderness in the area where the teeth were missing in the upper teeth and jaw area.  (R. at 458.)  Dr. Kimbrough stated that referral to a pain clinic for possible nerve blocks would be considered if Salyers could obtain insurance.  (R. at 458.)

An orthopedic clinic note from Dr. Daryl S. Larke, M.D., dated December 10, 2008, states that Salyers visited the emergency room approximately one week prior for the onset of right wrist pain, at which time he was given a wrist brace.  (R. at 314.)  Physical examination showed that Salyers had excellent strength, full range of motion and no abnormalities in the wrist. (R. at 314.) Dr. Larke diagnosed low-grade tendinitis of the right wrist, he suggested physical therapy, he told Salyers to wean himself from the wrist brace, and he prescribed Mobic. (R. at 314.)

Salyers saw Dr. Galileo T. Molina, M.D., on February 18, 2009, complaining of chronic low back pain. (R. at 324.) Salyers rated his pain at 8/10 before medication and at 4/10 with medication, which made him "functional." (R. at 324.) Salyers exhibited no muscle spasm, only mild tenderness, and straight leg raise testing was negative up to 90 degrees. (R. at 324.) He was prescribed Lortab, and an x-ray and MRI of the lumbar spine were ordered. (R. at 324.) On June 16, 2009, Salyers returned to Dr. Molina's office complaining of neck pain, which he reported having for several years, but which had recently worsened. (R. at 326.) Dr. Molina noted that Salyers was still carrying his order for an x-ray of the lumbar spine, and Salyers requested an order for an x-ray of his cervical spine as well. (R. at 326.) Dr. Molina noted that "[t]he patient moves freely with no apparent difficulty," and "[t]he patient appears drowsy and talks a lot." (R. at 326.) Salyers was advised to go directly to the hospital to fulfill the order for his x-rays, and was told if he did not, he would be sent a dismissal letter. (R. at 326.) On June 30, 2009, Salyers saw Dr. Kimbrough, who noted a normal examination with "no dental reason" for the pain Salyers described. (R. at 458.) During this same examination Salyers stated that his pain had improved with medications, specifically gabapentin and percocet. (R. at 458.) X-rays of Salyers's cervical spine, dated July 26, 2009, revealed no significant abnormality, and x-rays of the lumbar spine revealed only minimal L5-S1 spondylolisthesis. (R. at 328-29.)

From April 22, 2009, to June 6, 2010, Salyers visited Ronald F. Godat, D.D.S., and Pond with complaints of mouth pain and concerns that a bone was sticking out of his gum. (R. at 597-98.) Godat found nothing wrong on the x-ray or clinical examination of Salyers's mouth. (R. at 597.) During this time, Godat treated Salyers with cavity shield, a root canal and multiple prescriptions including Lortab, Percocet, Levaquin, amoxicillin and Cipro. (R. at 597-98.)

From October 22, 2009, to September 2, 2010, Salyers saw Dr. Kimbrough for neuropathic pain in his gums and jaw, as well as back pain. (R. at 560-62.) On October 22, 2009, Salyers reported continued dental work and associated problems, including swelling and severe pain in both the right upper and lower jaw. (R. at 562.) Salyers reported a desire to try nerve blocks, but Dr. Kimbrough stated the dental work needed to be completed and Salyers needed to obtain insurance. (R. at 562.) Salyers exhibited hypersensitivity in the right jaw and a little bit in the upper lip area. (R. at 562.) He had normal reflexes, strength and coordination. (R. at 562.) Dr. Kimbrough diagnosed neuropathic pain in the mouth and jaw, and he continued Salyers on gabapentin, Percocet, amitriptyline and Ultram. (R. at 562.) On March 10, 2010, Salyers reported sensitivity on the left side of the jaw following a root canal and apicoectomy. (R. at 561.) Dr. Kimbrough noted that this was unrelated to Salyers's previous problem, but was helped with his medications. (R. at 561.) Salyers also continued to have hypersensitivity of the right jaw. (R. at 561.) He had normal reflexes, strength and coordination. (R. at 561.) Dr. Kimbrough continued Salyers on his medications. (R. at 561.) On September 2, 2010, Salyers reported doing better, stating that the left-sided pain resolved when a sinus problem was cured. (R. at 560.) His pain was controlled with his medication regimen. (R. at 560.) Salyers did report increased back pain in the right SI joint region with some radiation into the sacrum after bending over. (R. at 560.) Reflexes were normal in the upper extremities and knee jerks, there was a slightly reduced reflex in the right ankle jerk and 1- in the left ankle jerk, and strength and coordination were normal. (R. at 560.) Despite tenderness over the right SI joint, Salyers had fairly good flexion and extension. (R. at 560.) Dr. Kimbrough diagnosed stable neuropathic pain in the mouth and jaw, as well as back pain, and he continued Salyers's medication regimen. (R. at

560.) He opined that Salyers's back seemed to be getting a little bit better, and he opted to "just watch it" at that time. (R. at 560.)

From June 16, 2009, to August 4, 2010, Salyers was treated by Dr. Esther Adade, M.D., and Dr. Molina for follow-up treatment and management of chronic low back syndrome.[8] (R. at 506-14.) During this time, Salyers was prescribed Lortab, and it was recommended that he see a pain management specialist. (R. at 506-14.) On August 17, 2009, Dr. Molina informed Salyers that x-rays and MRIs of the lumbar and cervical spine performed on July 26, 2009, showed no significant abnormality. (R. at 511.) The lumbar spine x-ray showed only minimal L5-S1 spondylosis. (R. at 511.)

On October 26, 2010, Robert Spangler, L.P.C., a licensed psychologist, completed a one-time psychiatric evaluation of Salyers. (R. at 588-95.) Spangler noted that Salyers had no speech problems and no obvious visual or hearing difficulties. (R. at 588.) He noted that Salyers had awkward motor movements, a slow stiff gait and age-appropriate fine motor skills. (R. at 588.) According to Spangler, Salyers generally understood the instructions for each task given to him, he demonstrated good concentration while on prescription medications and was appropriately persistent on the tasks, but he had to stand occasionally due to low back pain. (R. at 588.) Salyers reported that his medical and mental problems began at age 15 when he started using alcohol, smoking cannabis, taking pain pills, using IV drugs, snorting cocaine and "a lot of stuff." (R. at 588.) He further stated that he ceased all alcohol and street drug use in August of 2009. (R. at 588.) He reported pain from a birth defect in his back, disc prosthesis with minimal

_____

[8] The handwritten portions of these progress notes are largely illegible.

spondylosis, chronic mild disc bulging at the L4-L5 level, constant pain in his low back and a May 2004 motor vehicle accident that exacerbated his pain. (R. at 589.) Salyers also reported neck pain from mild degenerative disc disease, chronic pain in his right jaw and dental problems stemming from an accident that involved falling on a machete, as well as insomnia. (R. at 589.) Spangler deemed Salyers an adequate historian, who was rendered unable to work in 2004, who had received no mental treatment to date, and whose mental condition, namely a pain disorder, was progressive. (R. at 589.)

Salyers was alert and oriented and had adequate recall of remote and recent events. (R. at 590.) His affect was appropriate, and his mood was irritable. (R. at 590.) Salyers's judgment and insight were consistent with high average intelligence. (R. at 590.) His stream of thought was goal-oriented, associations were logical, thought content was nonpsychotic, and he appeared to be functioning in the high average range of intelligence. (R. at 590.) Spangler opined that Salyers was emotionally stable, but perceived chronic pain that was constant in his low back and right jaw. (R. at 590.)

Salyers reported going to bed at 2:00 or 3:00 a.m. and getting up at noon. (R. at 590.) He prepares food for himself, he shops for groceries, but someone else must push the cart, and he watches television from a recliner with his legs elevated for eight hours or more per day. (R. at 590.)

Spangler deemed Salyers's social skills as adequate, stating that he related well with the examiner. (R. at 590.) He opined that, due to Salyers's history of polysubstance dependence and alcohol abuse, he does not have the judgment necessary to handle his own financial affairs. (R. at 591.) Spangler administered

the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), test, on which Salyers obtained a full-scale IQ score of 112, placing him in the high average range of intelligence. (R. at 591.) Spangler also administered the Wide Range Achievement Test – Fourth Edition, ("WRAT-4"), which yielded scores consistent with those obtained on the WAIS-IV. (R. at 592.) Spangler considered the test scores a valid and reliable estimate of Salyers's abilities and achievement levels at that time. (R. at 591.)

Spangler diagnosed Salyers with a pain disorder, chronic, secondary to a general medical condition, moderate; and alcohol abuse and polysubstance abuse, both in full remission by report. (R. at 592.) He placed Salyers's then-current Global Assessment of Functioning, ("GAF"), score at 55.[9] (R. at 592.) Spangler deemed Salyers's prognosis guarded, and he stated that Salyers needed mental health treatment for the pain disorder, which especially impacted reliability. (R. at 592.)

Spangler also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on October 26, 2010. (R. at 593-95.) Spangler found that Salyers had a limited, but satisfactory, ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stress, to function independently, to maintain personal appearance, to behave in an emotionally stable manner and to relate predictably in

---

[9] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Assocation 1994). A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

social situations. (R. at 593-94.)  Spangler found that, with medication therapy, Salyers also had a limited, but satisfactory, ability to maintain attention and concentration.  (R. at 593.)  He found that Salyers had a seriously limited ability to understand, remember and carry out detailed, as well as simple, job instructions, and he found that Salyers had no ability to understand, remember and carry out complex job instructions or to demonstrate reliability. (R. at 594.)  Spangler noted that these findings were based on Salyers's diagnosis of a moderate pain disorder. (R. at 594.)

Spangler opined that Salyers's slow pace impacted his ability to carry out instructions, and his pain disorder impacted reliability significantly. (R. at 595.) He indicated that Salyers's college training was useless in a competitive sense due to his then-current pace.  (R. at 595.)  Spangler opined that Salyers would be absent from work more than two days a month. (R. at 595.)

On March 24, 2011, Dr. Kimbrough wrote a letter concluding that Salyers was unable to engage in any substantial gainful activity because of his physical and mental impairment related to chronic severe neuropathic pain in his mouth area. (R. at 627.)  He noted that Salyers had undergone multiple treatment modalities, and he stated, "we feel there is no further surgical intervention that would be of any benefit." (R. at 627.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires

the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §1382c(a)(3)(A)-(B) (West 2003 & Supp. 2012); *McClain v Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated December 2, 2010, the ALJ denied Salyers's claim. (R. at 12-20.) The ALJ determined that the medical evidence established that Salyers suffered from severe impairments, including back pain, neuropathic pain in the mouth and jaw and a pain disorder, but found that Salyers did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14.) The ALJ also found that Salyers had the residual functional capacity to perform a limited range of light work. (R. at 15.) Thus, the ALJ found that Salyers was able to perform his past relevant work as a customer service representative. (R. at 19.) Based on Salyers's age, education, work experience and residual functional capacity and the testimony

of a vocational expert, the ALJ also found that Salyers could perform other jobs existing in significant numbers in the national economy, including jobs as an assembler, a packer and an inspector/tester/sorter, all at the light level of exertion. (R. at 20.) Therefore, the ALJ found that Salyers was not under disability as defined in the Act and was not eligible for benefits. (R. at 20.) *See* 20 C.F.R.§§ 416.920(f), (g).

Salyers argues that the ALJ erred by failing to give full consideration to psychologist Spangler's findings regarding the severity of his mental impairments and the resulting effects on his work ability. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) He also argues that the ALJ erred by substituting his views for those of a trained mental health professional regarding the severity of his psychiatric impairments. (Plaintiff's Brief at 5.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997.)

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See*

*Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Salyers first argues that the ALJ failed to give full consideration to Spangler's findings on the severity of his mental impairments and the resulting effects on Salyers's work ability. (Plaintiff's Brief at 4-6.)   For the following reasons, I find this argument unpersuasive.

In general, the ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(c)(2) (2013). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). [10] In fact, "if a physician's opinion is not supported by clinical

---

[10] *Hunter* was superseded by former 20 C.F.R. § 416.927(d)(2), now renumbered as § 416.927(c)(2), which states, in relevant part, as follows:

If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic

evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Spangler, a licensed psychologist, completed a one-time Mental Assessment on October 26, 2010, concluding that Salyers had a seriously limited ability to understand, remember and carry out both detailed and simple job instructions. (R. at 594.) He further concluded that Salyers had no ability to understand, remember and carry out complex job instructions or to demonstrate reliability. (R. at 594.) In all other areas, Salyers was found to have limited, but satisfactory, abilities. (R. at 593-94.) Spangler based these limitations related to understanding, remembering and carrying out job instructions on Salyers's slow pace secondary to a pain disorder, which impacted the ability to carry out even simple instructions in a timely manner due to frequent breaks to stand or walk. (R. at 594.) Despite these findings, however, Spangler's report accompanying the psychological evaluation, completed the very same day as the Mental Assessment, is inconsistent with the previously mentioned limitations. Spangler's report states that Salyers generally understood the instructions for each task, he demonstrated good concentration, he was appropriately persistent on the tasks, and his slow pace did not impact his scores. (R. at 588.) Spangler also reported that Salyers's stream of thought was goal-oriented and that perceptual abnormalities were not apparent. (R. at 590.) Additionally, Spangler, on more than one occasion noted that Salyers functioned in the "high average range of intelligence." (R. at 590-91.) A mental status examination revealed that Salyers's thought content was nonpsychotic, and he showed no signs of delusions and had no suicidal or homicidal ideations. (R. at

techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

590.) Spangler deemed Salyers credible. (R. at 590.) Despite Spangler's finding that Salyers's slow pace did not impact his scores, he, nonetheless, later noted on the Mental Assessment that "slow pace impacts the ability to carry out instructions." (R. at 595.) Furthermore, during the evaluation, Spangler noted that Salyers generally understood the instructions for each task, demonstrated good concentration, and was appropriately persistent on the tasks given. (R. at 588.) However, Spangler later concluded in the Mental Assessment that Salyers's ability to understand, remember or carry out any type of job instructions was either nonexistent or seriously limited. (R. at 594.)

Additionally, I find that the objective evidence of record does not support Spangler's opinion that Salyers's mental impairment, which was secondary to a general medical condition, would result in his absence from work more than two days monthly or that it would significantly impact his reliability. With regard to Salyers's back and neck pain, the diagnostic testing and clinical findings revealed no more than minimal findings. More specifically, MRIs and x-rays of the lumbar spine performed in 2008 showed only a mild bulging disc at the L4-L5 disc space level with no narrowing of the central spinal canal or neural foramina. (R. at 260, 429.) An MRI of the cervical spine performed in 2008 showed only mild degenerative disc disease without focal disc herniation or significant central canal stenosis. (R. at 258.) An x-ray of the cervical spine performed in 2009 showed no significant abnormality, while an x-ray of the lumbar spine showed minimal L5-S1 spondylolisthesis. (R. at 328-29.) Physical examinations during 2008 and 2009 support these mild diagnostic findings. For example, in July 2008, Salyers's back was nontender, he had a painless range of motion, and there was a normal inspection of the back. (R. at 381.) In September 2008, Salyers again had no back tenderness, exhibited a painless range of motion, had negative straight leg raise

testing bilaterally and had a normal overall back inspection. (R. at 432-33.) In February 2009, Salyers had no muscle spasms, exhibited only mild tenderness and demonstrated negative straight leg raise testing up to 90 degrees. (R. at 324.) In June 2009, Dr. Molina noted that Salyers "moves freely with no apparent difficulty." (R. at 326.) In October 2009, and again in March 2010, Salyers had normal reflexes, strength and coordination. (R. at 561-62.) In September 2010, knee jerk reflexes were normal, as were strength and coordination. (R. at 560.) Despite tenderness over the right SI joint, Salyers had fairly good flexion and extension. (R. at 560.) Dr. Kimbrough opined that Salyers's back pain seemed to be getting a little bit better, and he opted to "just watch it" at that time. (R. at 560.)

Furthermore, I find that Salyers's activities of daily living are inconsistent with Spangler's finding that his impairments would significantly impact his reliability and cause him to miss more than two work days monthly. In a Function Report dated September 6, 2008, Salyers reported living with his mother, whom he helped with the cleaning and shopping responsibilities. (R. at 161-68.) He also reported helping his mother with her nebulizer treatments and medications, preparing food for her and driving her places. (R. at 162.) Salyers reported that he prepared meals for himself daily, watched television and movies, played video games and browsed the internet. (R. at 163, 165.) He also reported that he talked on the phone and went to friends' homes on occasion. (R. at 165.) Salyers estimated that he could lift items weighing up to 50 pounds, sit for up to two hours, kneel for up to 10 minutes, squat for up to 10 minutes and walk for up to two miles before having to stop and rest for 10 to 15 minutes. (R. at 166.) He stated that he could pay attention for as long as needed, he could follow written instructions "very well," he could follow spoken instructions "very well," he got along "fine"

with authority figures, he handled stress "fine," and he handled changes in routine "fine." (R. at 166-67.)

With regard to Salyers's mouth and jaw pain, the record shows that this began following an accident in October 2007. Subsequent to that time, Salyers underwent multiple root canals and other dental procedures. Despite these procedures, Salyers complained of near constant pain, and he requested pain medication on a regular basis, often times before his prescription allowed. However, x-rays on January 20, 2008, were normal and looked "great" according to Elliott. (R. at 491.) At that time, Salyers was advised to take only over-the-counter pain medication. (R. at 491.) In October 2008, Dr. Kimbrough diagnosed Salyers with neuropathic pain in the mouth and right jaw and prescribed gabapentin and Percocet. (R. at 460.) Despite Salyers's concern that a bone was sticking out of his gums, in April 2009, x-rays and clinical examination were normal. (R. at 597.) In June 2009, Dr. Kimbrough reported that medications had helped overall. (R. at 458.) On January 6, 2010, Salyers's x-rays again looked "good" according to Elliott. (R. at 498.) When Salyers saw Dr. Kimbrough on September 2, 2010, he reported doing better. (R. at 560.) Dr. Kimbrough found Salyers's pain was controlled with his medication regimen. (R. at 560.) Dr. Kimbrough diagnosed stable neuropathic pain in the mouth and jaw. (R. at 560.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Moreover, I find important that, despite his complaints of near constant, severe pain in the mouth and jaw from 2007 to at least some time in 2010, Salyers failed to voice regular complaints about difficulty eating. At the hearing on November 8, 2010, there was no such testimony. The medical records prior to the

accident precipitating these problems in October 2007 reveal that Salyers's weight ranged from a low of 202 pounds in November 2003 to a high of 226 in June 2004. (R. at 268, 271.)  Near the time of the accident, on October 29, 2007, Salyers weighed 220 pounds.  (R. at 356.)  By January 31, 2008, Salyers's weight had dropped to 205 pounds, but by February 29, 2008, it was 215, and on November 11, 2008, Salyers weighed 222.5 pounds.  (R. at 262, 263, 506.)  On June 16, 2009, Salyers's weight got up to 232.5 pounds.  (R. at 506.)  It is clear from the record that Salyers's weight fluctuated.  However, that also was the case prior to the accident, as well.  What I find most relevant is that, despite Salyers's persistent complaints of severe pain and numerous requests for pain medication, he rarely complained of difficulty eating, and his weight did not progressively decrease.  I further find important that Dr. Kimbrough's last examination of Salyers that is contained in the record reflects that he was doing better.  (R. at 560.)  Nonetheless, Dr. Kimbrough submitted a letter dated March 24, 2011, concluding that Salyers was unable to perform substantial gainful activity due to his neuropathic mouth and jaw pain.  (R. at 627.)  For the reasons already stated, I find that this opinion is not supported by the other substantial evidence of record, including the last treatment note from Dr. Kimbrough himself.  Further, pursuant to the regulations, the ultimate issue of disability is reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d) (2013).  That being the case, Dr. Kimbrough's opinion on this issue is not given controlling weight.

It is for all of these above-stated reasons that I find that substantial evidence exists in the record to support the ALJ's decision to give little weight to the findings of psychologist Spangler.

Salyers also argues that the ALJ erred by substituting his own opinion for that of a trained mental health professional by according little weight to Spangler's opinion. I also am not persuaded by this argument. While it is true that Spangler's opinion is the only one from a mental health professional contained in the record, it does not follow that the ALJ was bound to accept it in its entirety. The ALJ, "[i]n the absence of any psychiatric or psychological evidence to support his position, … simply does not possess the competence to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). The ALJ may not simply disregard uncontradicted expert opinion in favor of his own opinions on a subject that he is not qualified to render. *See Young v. Bowen*, 858 F.2d 951, 956 (4th Cir. 1988); *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984).

I find that the portions of Spangler's opinions to which the ALJ accorded little weight, namely that Salyers's reliability was significantly impacted by his impairment, and he would be absent from work more than two days monthly, were, in fact, contradicted by other substantial evidence in the record for all of the reasons already stated herein. I further find that the remainder of Spangler's findings are appropriately accounted for in the ALJ's residual functional capacity finding. All of this being the case, I find that the ALJ did not err by improperly substituting his opinion for that of a trained mental health professional.

Based on the above-cited evidence, I find that substantial evidence supports the ALJ's weighing of the evidence as to Salyers's mental impairments and that he did not err by improperly substituting his judgment for that of a trained mental

health professional. Therefore, I find that substantial evidence supports the ALJ's finding that Salyers is not disabled and not entitled to SSI benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's weighing of the evidence related to Salyers's mental impairments;

2.  The ALJ did not improperly substitute his judgment for that of a trained mental health professional; and

3.  Substantial evidence exists in the record to support the ALJ's finding that Salyers was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Salyers's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. §636(b)(1)(C) (West 2006 & Supp. 2013):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     August 23, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE